Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4567 | **DATE** | 5/3/2001 |
| **CASE TITLE** | Kirsten E. Steeves vs. Stephen McGrath | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [13] is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| ✓ | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

Number of notices

MAY 08 2001 date docketed

docketing deputy initials

Document Number: 24

courtroom deputy's initials: RJ

FILED FOR DOCKETING
01 MAY -7 PM 4:34

Date/time received in central Clerk's Office

MAY 08 2001 date mailed notice

mailing deputy initials

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KIRSTEN E. STEEVES, ) | |
| Plaintiff, ) | |
| ) | No. 99 C 4567 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| STEPHEN McGRATH, ) | |
| Defendant. ) | |

MAY 08 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff Kirsten Steeves (formerly Kirsten Benner-Mulvihill) filed suit against defendant Stephen McGrath, seeking recovery under 42 U.S.C. § 1983 for malicious prosecution and false arrest. McGrath has moved for summary judgment. For the reasons set forth below, McGrath's motion for summary judgment is granted.

### Background

Steeves is an attorney practicing family law as a sole practitioner in Peotone, Illinois. McGrath is an investigator with the Will County Sheriff's Office. Steeves represented Beverly Knickrehm in connection with certain matters arising from Beverly's divorce from her ex-husband Leland Knickrehm. One of the matters Steeves handled was the payment of certain marital obligations of the Knickrehms, including the payment of a student loan that Leland Knickrehm had guaranteed for his daughter. That student loan was in default and had been sold by Student Loan Marketing Association (Sallie Mae) to the guarantor, the Illinois Student Assistance Commission (ISAC) for collection. Pursuant to a settlement agreement, Beverly and Leland were to pay approximately $3000 each to pay off the entire balance of the loan. Steeves agreed to forward the payments to ISAC for the Knickrehms. Both Beverly and Leland then

delivered to Steeves checks for approximately $3000, made payable to ISAC.

Instead of sending the checks to ISAC, in Deerfield, Illinois, Steeves sent the checks to the Sallie Mae payment center in Killeen, Texas. Steeves contends, and the court will assume for purposes of resolving this motion, that this was an honest mistake. It so happens that Steeves had an outstanding student loan with Sallie Mae, with a balance of approximately $26,000 at the time. Steeves had been having trouble staying current on her loan payments to Sallie Mae. Her loan payments had been deferred on the basis of financial hardship for the maximum number of times. She had received 50 late notices since her loan went into repayment, and had received 7 late notices in the first 10 months of 1997. She had also been telephoned by Sallie Mae regarding her delinquent loan. Steeves admits that she had been having other financial difficulties as well, with her total monthly expenses apparently exceeding her monthly income.

The Knickrehm checks were cashed by Sallie Mae (even though the checks were made payable to ISAC), and the credit was applied to Steeves' account. When the two canceled Knickrehm checks were returned to Beverly and Leland Knickrehm, they each had the same handwritten number on the front, written in felt tip pen. That number was later discovered to be Steeves' social security number – also the number of her Sallie Mae loan account. After Leland received late notices from ISAC indicating that his daughter's loan had not been paid off, he contacted ISAC to find out why there was an outstanding balance, despite his receipt of the canceled check. An ISAC representative then examined the check, researched the situation, and discovered that the check had been sent to Sallie Mae and had been credited toward Steeves' own account. The ISAC representative suggested that Leland should contact the State's Attorney's Office, because there was some evidence of fraud.

The Will County State's Attorney's Office then commenced an investigation into the matter. Because of a perceived conflict of interest, the Will County State's Attorney's Office did not complete the investigation, and requested the assistance of the Illinois Attorney General's Office. Assistant Attorney General Michael Rosenblat was assigned to the prosecution of the case. Rosenblat enlisted the Will County Sheriff's Office to aid in the investigation. Defendant McGrath, an investigator for the Sheriff's Office, was assigned to assist Rosenblat in the investigation. McGrath was also named Grand Jury Investigator by the grand jury, giving him subpoena powers.

A search warrant was then issued for the search of Steeves' law offices. Inside, those executing the search warrant found a repayment coupon book for Steeves' Sallie Mae loan. Although the search took place on October, 1997, the monthly coupons for October, 1997 through June, 1998 were missing.[1] The total amount of payments due on Steeves' loan from

---

[1] Steeves disputes the characterization of the coupons as "missing." (Pl.'s Rule 56.1 Reply at ¶ 30). Steeves claims that the record does not support such characterization. However, Michael Rosenblat testified that when they conducted the search, "payment slips were missing for October [through] July." (Exh. D at 37-38). By the term "missing," the court takes this testimony to mean that the payment slips for those months were not found in the coupon book or elsewhere in the folder of business and personal financial materials that Steeves maintained at her office. (Exh. 1 at 93-94). Steeves cites her own deposition testimony to refute the characterization of the slips as "missing," but nothing in her deposition indicates that the slips were found. Rather, her testimony simply gives an explanation for why they were not there. Steeves testified that she kept only one coupon in the folder so that she would be able to find the address to mail her payments to. Her testimony also suggests that she did not usually send in payment slips with her checks. (Exh. 1 at 93-96). But this is merely an explanation, and does not refute the fact that the slips in question were not found. The court should also note that there is a minor discrepancy in the evidence concerning which coupons were missing. While Rosenblat testified that slips for October through *July* were missing, the coupon book itself, Exhibit F, apparently contained only one payment slip with a due date of July 7, 1998. McGrath also testified that the coupon book contained only a slip for July, 1998. (Exh. B at 48). Apparently, then, it was the October through *June* slips that were not found, as McGrath contends in his statement of fact. Steeves does not dispute the dates of the slips in question, and

3

October, 1997 through June, 1998, including amounts that were past due in October, would have been approximately $6000. In other words, the amount of the Knickrehm checks would have been roughly the same amount necessary to pay off Steeves' past due amounts and make payments in advance through June, 1998.[2] The Knickrehm checks were submitted to a forensic handwriting expert, in order to compare the handwritten number on them to the known writings of Steeves. In February, 1998, the expert issued a report stating that there were "excellent similarities" between the writing on the Knickrehm checks and Steeves' writing, but was unable to make a positive identification for three reasons: (1) the amount of questioned writing was limited; (2) fiber tip pens can mask details in line quality; and (3) the range of variation in the questioned entries was wider than that found in Steeves' known writings. (Exh. H). After Steeves was indicted for theft and forgery, Steeves sought the opinion of another handwriting expert, who concluded that the writing on the checks was not written by the same person as the writing on the known samples. (Exh. 13). The search also uncovered a copy of a letter from Sallie Mae to ISAC, indicating that Steeves had mailed a letter concerning the Knickrehm loan to

---

Steeves' deposition testimony does not refute the conclusion that only a slip for July, 1998 was found.

[2] Again, Steeves denies that these facts are undisputed. The record, however, indicates otherwise. Rosenblat testified that the amount of the checks and the amount necessary to pay off Steeves' loans up to July, 1998 were "within that ball park." (Exh. D at 58-59). Steeves correctly points out that Rosenblat also testified that he was told by a Sallie Mae representative that it appeared that the Knickrehm checks came in without payment slips. This fact, however, does not refute the fact that the amount of the Knickrehm checks was approximately equal to the amount needed to pay up to July, 1998 on the Steeves loan. Moreover, Rosenblat said the conversation with the Sallie Mae representative took place in July, 1998 – well after the indictment was issued. As will be discussed below, evidence obtained after the indictment is not relevant to the determination of probable cause.

4

Sallie Mae, rather than to ISAC, by mistake. (Exh. 5). Steeves received a courtesy copy of that letter.

McGrath and Rosenblat also investigated the check processing procedures at Sallie Mae. Because they spoke with Sallie Mae representatives both before and after the indictment was issued, it is unclear from the record exactly what information was known about the check processing procedures at the time of the indictment. What is clear is that they were originally told that Sallie Mae was not able to determine whether the Knickrehm checks came in with payment slips. It is also clear that the investigators eventually discovered that when checks are received by Sallie Mae, the contents of the envelope are removed and the envelope itself is destroyed. The payment slips or any letters or notes directing the payment are also eventually destroyed, and are not logged anywhere. Sallie Mae representatives also told investigators that the only way to associate the Knickrehm checks with the name Mulvihill (Steeves' previous name and the name her loan was held under) would be through a letter of direction, an account number noted on the checks when received, or the inclusion of a payment coupon. Investigators also discovered that when the name Knickrehm was entered into the computer at Sallie Mae, the screen indicated that the Knickrehm loan was in default and had been sold to the guarantor, ISAC, and that payments were to be made there. Finally, Sallie Mae representatives told investigators that the Mulvihill name would not be associated with the Knickrehm account if the checks were simply placed in her business envelopes, because the envelopes were destroyed without referencing the return address.

Rosenblat presented McGrath as a witness before the grand jury on March 11, 1998. On the same day, the grand jury returned a true bill charging Steeves with theft and forgery. The

5

charges against Steeves were published by the Illinois Attorney General in a statewide press release announcing her indictment. Steeves argues that the indictment was the product of McGrath's false testimony. The testimony in question is as follows:

Are there any questions from the grand jury on this case?

    JUROR: I have a question. Just because the social security number was on there, that went automatically to her account?

    THE WITNESS: What happened with this situation is that the attorney, Mulvihill, made the arrangements. The Knickrehms get divorced -

    JUROR: I understand all that.

    THE WITNESS: The bills get split. But the payments which, by arrangement through the Attorney Mulvihill, were supposed to be sent to the Illinois Student Assistance Commission. They handle college loans which are in default. They are based in Deerfield, Illinois. Kirsten Benner-Mulvihill's college loans, which are not in default, her payments are made through Sallie-Mae, which is another organization that does college loans. She makes her payments to Kileen, Texas.

    JUROR: But she didn't have to counter-sign the check on the back, because her social security number was on there?

    THE WITNESS: Payments are made - when payments are made, as when I talked to Sallie-Mae, they don't care who the check comes from as long as it's got the account number, which is the individual's social security number, and it's got the payment slip. And then we find her payment slip book and the payment slips are gone until next July of 1998.

    JUROR: Wasn't that check - I mean instead of the check being made out to Sallie-Mae it was made out to some, you know, place here within Illinois, right?

    THE WITNESS: Yeah, the Knickrehms made the checks out themselves to the Illinois Student Assistance Commission.

    JUROR: How could the other company -

    THE WITNESS: As long as a payment slip is there and the person's account number is on there, they don't care who it's made out to,

as long as the payment slip is with it and their account number is on the check. That goes for just about anybody I've discovered, since doing this investigation.

    JUROR:    How could they endorse the check though?

    THE WITNESS:    They flip it over and put their stamp on it and it goes to their bank. As long as the deposit slip is there from the account holder and their account number is written on the check.

    JUROR:    And it basically states student loan.

    THE WITNESS:    And it says something about student loan. As long as it's close. But Deerfield, Illinois and Kileen, Texas are not close.

    (Pl. Ex. 9, pp. 13-16)

Steeves argues that McGrath's testimony, given its context, was false. The implication that McGrath was trying to convey, Steeves contends, was that Steeves wrote her own social security number on the Knickrehm checks or included at least one payment slip with them. Steeves points to evidence that McGrath had discovered before the grand jury hearing that allegedly belied his testimony: (1) that Sallie Mae was unable to determine whether a payment slip had been included with the checks; (2) that McGrath spoke with someone at Sallie Mae who said that they could have written a number on a check like that; (3) that McGrath knew that Sallie Mae deposited all checks regardless of how they were made payable. Steeves claims that McGrath's false and misleading testimony caused the grand jury to indict her. Shortly after the indictment was issued, Steeves was arrested.

Following the indictment, Steeves' counsel met with the prosecutors and obtained their agreement to *nolle pros* the case. Before the court, the prosecutors voluntarily *nolle prossed* the case without further comment. The order entered by the court did not indicate the reason for the dismissal. However, reading the record in the light most favorable to Steeves, there is at least

some evidence of the circumstances surrounding the *nolle pros* to suggest that the prosecutors agreed to *nolle pros* the case because of shortcomings in the evidence against Steeves. Steeves then initiated this action for malicious prosecution.

McGrath previously filed a motion to dismiss both the malicious prosecution claim and the false arrest claim, which was denied by this court. *Steeves v. McGrath*, 2000 WL 198895 (N.D. Ill. Feb. 11, 2000). Now before the court is McGrath's motion for summary judgment.

## Analysis

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. *See Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir. 1991). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

*Malicious Prosecution*

Section 1983 provides a cause of action for persons who have been deprived of any "rights, privileges, or immunities" secured by the U.S. Constitution or federal laws. 42 U.S.C. §

8

1983. The Seventh Circuit has recognized that a criminal defendant prosecuted without reasonable grounds may bring an action for malicious prosecution under § 1983, "ostensibly for a violation of his Fourth Amendment rights." *Cervantes v. Jones*, 188 F.3d 805, 808 (7th Cir. 1999). Initially, it should be noted that malicious prosecution claims are generally disfavored by law because of the possibility that they will deter the reporting of crime. *See Logan v. Caterpillar, Inc.*, ___ F.3d ___, No. 99-3972, 2001 WL 355693 (7th Cir. Apr. 4, 2001). In order to overcome a motion for summary judgment, a plaintiff alleging malicious prosecution under § 1983 must present sufficient evidence to create a genuine issue of material fact as to the following elements of the constitutional tort: "(1) he has satisfied the requirements of a state law cause of action for malicious prosecution; (2) a state actor committed the malicious prosecution; and (3) he was deprived of liberty." *Cervantes*, 188 F.3d at 809 (citing *Sneed v. Rybicki*, 146 F.3d 478, 480 (7th Cir. 1998) and *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996)). McGrath does not dispute that the second and third elements have been met. Thus, the only element relevant to the present motion is the first one. Under Illinois law, the elements of the tort of malicious prosecution are: "(1) the plaintiff was subject to judicial proceedings; (2) for which there was no probable cause; (3) the defendant instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Id.* (citing *Rybicki*, 146 F.3d at 480-81, and *Reed*, 77 F.3d at 1051).

McGrath makes three arguments in support of summary judgment: (1) that McGrath has a complete defense to Steeves' claim because there was probable cause to indict Steeves independent of McGrath's testimony; (2) that McGrath is entitled to absolute immunity for testifying in front of a grand jury; and (3) that Steeves has not presented evidence sufficient to

establish all of the elements of malicious prosecution. Because the court finds the undisputed evidence sufficient to establish probable cause, the court need not address McGrath's second and third arguments.[3]

"The existence of probable cause for the prosecution is a complete defense to an action for malicious prosecution under both Illinois and federal law." *Id.* at 810-11 (citing *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989) and *Burghardt v. Remiyac*, 565 N.E.2d 1049, 1052 (Ill. App. Ct. 1991)). Determining whether probable cause existed is a mixed question of law and fact. *Id.* at 811. "But when facts sufficient to create probable cause are undisputed, probable cause is a question of law." *Id.* (citations omitted). Probable cause means "the existence of such facts and circumstances as would excite the belief, in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." *Id.* (citations omitted). This test is one of objective reasonableness, and in making this determination the court is to consider the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (citations omitted); *see also Simmons v. Pryor*, 26 F.3d 650, 655 (7th Cir. 1993).

In most cases, a grand jury indictment is *prima facie* evidence of probable cause. *See Cervantes*, 188 F.3d at 811 n.7 (citing *Bontkowski v. United States*, 28 F.3d 36, 37 (7th Cir.

---

[3] The court notes in passing that the facts relating to immunity in this case are quite similar to the facts of *Cervantes*. In *Cervantes*, the district court granted summary judgment relying, in part, on the defendant's claim of immunity. The Seventh Circuit found the question of immunity to be a "closer question than the district court suggested." *Cervantes*, 188 F.3d at 810. The court affirmed on grounds of probable cause rather than resolving the more difficult immunity question.

1994)). Here, however, the plaintiff argues that McGrath's allegedly false testimony directly led to the indictment. In other words, the indictment was the product of McGrath's perjury. In a case like this, the court must disregard the grand jury's indictment and the disputed testimony, and instead examine only the evidence that the prosecutor had when he sought the indictment. *See id.* "A contrary rule could allow an indictment procured by lies to protect a witness from liability for his perjury." *Id.* (quoting *Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir. 1997)). Finally, when making the probable cause determination, the court must consider both the inculpatory and exculpatory evidence that was present at the time of the decision to prosecute. *See generally id.* at 813-14 (must consider totality of the circumstances, including exculpatory evidence, that prosecutor had at the time); *Mack v. First Sec. Bank of Chicago*, 511 N.E.2d 714, 717 (Ill. App. Ct. 1987) (probable cause determined as of the time prosecutor signs criminal complaint). Although both parties, in their submissions to the court, blur the line between what was known at the time of the indictment and what was learned in later investigations, the court has attempted to sort out the evidence and consider only that evidence known by the prosecutors at the time of the indictment.

The evidence at the time of the indictment, disregarding McGrath's allegedly false testimony, was sufficient to lead a reasonable person to the strong suspicion that Steeves had committed theft and forgery. Steeves contends that, absent McGrath's testimony, the evidence of misconduct "never rose above the level of a guess or conjecture," and that there was "an absolute absence" of evidence that plaintiff intended to convert the checks or forge writing on them. (Pl.'s Resp. at 3). The court disagrees. The evidence that undisputedly existed, while not overwhelming, was certainly sufficient to excite the belief in a reasonable mind that Steeves had

11

intentionally sent the checks to Sallie Mae in an effort to apply the funds to her account, by either writing her social security number on the checks or by submitting her own payment slips along with the checks. Considering only the undisputed evidence, and only the evidence that undisputedly was within the knowledge of the prosecutors at the time of the indictment, the court finds that the prosecutors knew of the following inculpatory evidence: (1) the Knickrehm checks were sent from Steeves' office to the Sallie Mae payment center; (2) Steeves had received a copy of a letter from Sallie Mae to ISAC indicating that the Knickrehm account funds should be sent to ISAC in Deerfield, Illinois;[4] (3) Steeves' social security number (also her account number) was written on the Knickrehm checks; (4) a handwriting expert noted "excellent similarities" between the writing on the checks and Steeves' known samples, although the expert was not able to make a positive match; (5) Steeves had been having financial difficulties, and had been late in her payments to Sallie Mae several times; (6) in October, 1997, Steeves was in possession of a coupon book containing only a payment slip for July, 1998, and the amount of the checks was roughly the same as the amount necessary to pay her loan up to July, 1998.

When viewing all of these facts as a whole, they constitute sufficient circumstantial evidence to create the suspicion in a reasonable mind that Steeves intended to use the Knickrehm checks toward her own loan account at Sallie Mae, and that she either wrote her social security number on the checks or submitted payment slips with checks. Much of the exculpatory

---

[4] As Steeves points out, this evidence could be taken in two ways. That Steeves was copied on the letter tends to show that Steeves had notice of the correct mailing address for the Knickrehm checks. But it also suggests that Steeves had previously made the mistake of inquiring to Sallie Mae about the Knickrehm loan, and thus might be likely to make a similar mistake by sending payments to Sallie Mae. In evaluating the totality of the evidence available to the prosecutor, the court was mindful of the dual importance of the letter.

evidence that Steeves relies on in response to the motion for summary judgment is irrelevant because it was not known to the prosecutors or investigators until after the indictment had been issued. Steeves points to her own handwriting expert who concluded that the numbers on the checks were not written by Steeves. But that report was not completed until April 7, 1998, approximately one month after the indictment was issued. Steeves also repeatedly relies on evidence that Sallie Mae told investigators that the checks came in alone. But this evidence did not come to light until after the indictment. Rosenblat testified that he found out the checks came in alone when talking to a Sallie Mae representative named Eula in July, 1998. (Exh. D at 32, 37). Similarly, Steeves argues that Sallie Mae admitted that the checks were deposited due to their own error. A Sallie Mae representative did tell McGrath that "Sallie-Mae's official position in this case is that human error could be involved." (Exh. 17). But that statement was made in a July 16, 1998 interview, after the indictment had been issued.

Other evidence that Steeves refers to is either not exculpatory at all, or of little probative value. Steeves presents evidence that Rosenblat refused to discuss the approval of charges, and testified that the issue of whether there was probable cause to indict was left solely to the grand jury. These facts, however, do nothing to undermine the evidence of probable cause that existed at the time of the indictment. Steeves also reminds the court that at the time of the grand jury hearing, McGrath had been told by Sallie Mae that Sallie Mae would have no way of knowing whether the Knickrehm checks came with payment slips. This might have shown that one line of direct evidence was cut-off, but it did not tend to show that Steeves checks came in alone. Nor did it preclude prosecutors from showing through circumstantial evidence, including the coupon book with coupons missing through June, 1998 and the approximate value of the checks

compared to the payments due through that month, that plaintiff probably sent her coupons with the Knickrehm checks. Nor did it undermine the prosecution's evidence that Steeves may have written her own social security number on the checks, providing an alternative means of associating the checks with her account.

Finally, Steeves cites evidence that McGrath knew that Sallie Mae deposited all checks regardless of how they were made payable. It is not clear from the record when McGrath knew this information. (Exh. 10 at 44-46). Even assuming that McGrath knew this information when he testified to the grand jury, however, the evidence has limited probative value. It does tend to show that if Steeves had simply made a mistake, without writing on the checks or submitting her payment slips, the checks would have been deposited. What it does not show is that Steeves made a mistake. It is not inconsistent with the prosecution's evidence suggesting that Steeves either submitted payment slips or wrote her social security number on the checks. It is also of limited probative value because it only shows how the checks could have been cashed – it does not show how the funds could have been applied to Steeves' account. Thus, considering the totality of the circumstances, including both the inculpatory and exculpatory evidence available to prosecutors at the time of the indictment, probable cause existed to indict Steeves for theft and forgery, even without considering McGrath's allegedly false testimony. The defendant is entitled to summary judgment as to the malicious prosecution claim.

*False Arrest*

The parties mention the false arrest claim only in passing. Neither party makes any substantive arguments with respect to the false arrest claim in their summary judgment briefs. As with malicious prosecution, the existence of probable cause is a complete defense to a claim

prosecute Steeves existed as of that date necessarily means that probable cause to arrest her existed as well. *See generally Kelley*, 149 F.3d at 646 (probable cause to arrest exists when the facts and circumstances known to the arresting officers are sufficient to warrant a prudent person to believe that the suspect has committed a crime). None of the later-discovered exculpatory evidence was available at the time of the arrest. Hence, the defendant is entitled to summary judgment with respect to the false arrest claim.

## Conclusion

Because the court finds no genuine dispute as to any of the material facts establishing, as a matter of law, that probable cause to prosecute Steeves existed at the time of the indictment, defendant's motion for summary judgment is granted.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: May 3, 2001